**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| v. | Case No. 7:19-CR-9 (HL) |
| **JASON VASHON JONES**, | |
| Defendant. | |

**ORDER**

Before the Court is Defendant Jason Vashon Jones' Motion to Suppress Evidence. (Doc. 30). This matter came before the Court for an evidentiary hearing on March 15, 2021. During the hearing, the parties reported to the Court that the body camera footage from Lieutenant Robert Picciotti, the lead investigator in this case, for some reason was never made a part of the Government's file and, hence, had not been provided to Defendant. (Doc. 46, p. 7-8). Lieutenant Picciotti produced the video the morning of the hearing. Defendant requested the opportunity to review the video after the hearing and to reconvene the hearing if necessary. (Id. at p. 8). The Government agreed. (Id.).

The Court conducted a second hearing on August 24, 2021. At the conclusion of the hearing, Defendant requested leave to file a post-hearing brief following production of the hearing transcript. Both Defendant and the Government have now submitted their post-hearing briefs, and the motion is ripe

for review. Upon consideration of the testimony and evidence produced during the two hearings, the Court **DENIES** Defendant's Motion to Suppress.

## I.     BACKGROUND

Lieutenant Robert Picciotti is an officer with the Lowndes County, Georgia Sheriff's Office. (Doc. 46 at 11). He is assigned to the local Federal Bureau of Investigation ("FBI") task force. (Id.). Lieutenant Picciotti has worked in law enforcement for over twenty years. (Id.). During his career as a law enforcement officer, Lieutenant Picciotti has participated in excess of four thousand cases involving illegal drug activity. (Id. at 12).

In June 2018, a cooperating source notified law enforcement agents that Defendant Jason Vashon Jones, with whom Lieutenant Picciotti was familiar from an earlier investigation, was receiving marijuana through the mail from an out-of-state supplier. (Id. at 12-13). The source was known to law enforcement agents prior to this report. (Id. at 13). He previously provided information to agents leading to the location of wanted persons and to the recovery of narcotics and firearms. (Id.). According to the source, Defendant resided at 2311 Corey Drive but was distributing narcotics from a residence located at 200B Springhill Street in Valdosta, Georgia. (Id.). The two residences were three to four miles apart. (Id.). The source further reported that Defendant possessed a firearm. (Id.).

As part of his initial investigation, Lieutenant Picciotti conducted a records check to determine who had possessory interest in the Springhill Street address.

2

(Id. at 15). Picciotti ascertained that the utilities for 200B Springhill Street were registered in the name of Joey Jones. (Id.). Picciotti then contacted the Georgia Department of Community Supervision ("DCS"), who advised the Lieutenant that Defendant was on probation for a 2015 felony offense in Cook County, Georgia and that he was subject to a Fourth Amendment waiver. (Doc. 46 at 15-16; Doc. 44-1). DCS listed Defendant's address as 1735 Largo Circle. (Doc. 46 at 15). A criminal history check for Defendant revealed multiple drug-related convictions. (Id. at 16).

Lieutenant Picciotti conducted surveillance at both 2311 Corey Drive and 200B Springhill Street between June 2, 2018 and June 13, 2018. (Id. at 13-14). He observed an individual fitting the description of Defendant driving a champagne-colored Tahoe with a Georgia license plate traveling between the two addresses. (Id. at p. 14). The individual appeared to live at the Corey Drive residence with a Ms. Cato. (Id. at 14, 56, 59). The few times Picciotti drove past the Largo Circle address DCS provided for Defendant, he never saw Defendant's Tahoe or any other vehicle. (Id. at 56, 58).

Picciotti surveilled the Springhill Street address from a strategic location on Blitch Street. (Id. at 15, 47). The officer estimates he conducted surveillance at this location between eight and ten times. (Id. at 47). The amount of time Picciotti spent watching the residence varied. (Id.). Sometimes he would spend several hours. (Id.). Other times, he would only be there for thirty minutes. (Id.).

3

Lieutenant Picciotti noticed several individuals frequenting the residence, including Frederick Nelson Barrett.[1] (Id. at 17, 48). Lieutenant Picciotti also identified Defendant in his champagne-colored Tahoe coming and going from 200B Springhill Street. (Id.). Defendant utilized a key to enter the Springhill Street home. (Id. at 48). Observing that no vehicle was parked at the residence on a regular basis and that the lights were not on at consistent times, Lieutenant Picciotti concluded that no one lived at 200B Springhill Street. (Id. at 18).

From Picciotti's vantage point on Blitch Street, and with the use of binoculars, the officer could see a trash can located against the wall of the Springhill Street residence. (Id. at 15, 49). On June 12, 2018, Lieutenant Picciotti noted several cardboard shipping boxes inside the trashcan. (Id. at 14, 17, 49). He had not previously seen the boxes. (Id. at 14). The next day, he observed another box sticking out of the top of the trashcan. (Id. at 17, 50). Picciotti made the decision to organize a "trash pull"." (Id. at 17). He contacted the City of Valdosta Utilities Department to confirm trash collection for the neighborhood would occur the next morning between 5:00 a.m. and 7:00 a.m. (Id. at 17, 50).

Around 4:00 a.m. on June 14, 2018, Lieutenant Picciotti, Sergeant Kenny Busby, and Investigator Jeremy Williams performed the trash pull. (Id. at 17, 51). Lieutenant Picciotti testified that the trashcan for 200B Springhill Street had been

---

[1] During his testimony, Lieutenant Picciotti also referred to a Floyd Barrett. (Id. at 48). It is unclear whether Frederick and Floyd Barrett are the same person.

4

moved from the side of the house to the street. (Id. at 19, 51). The three officers retrieved the contents of the trashcan, including several large boxes and foam coolers. (Id. at 19, 52). They transported these items to the Sheriff's Office for further examination. (Id.).

The boxes contained shipping labels for three different addresses: 200B Springhill Street, 2311 Corey Drive, and Cumming Street. (Id. at 19). Each had a return address for Ailene Meats in Oregon. (Id. at 20). Inside the foam coolers, the officers found coffee grounds, vacuum packaged bags, and sealed freezer bags that appeared to have marijuana residue in them. (Id. at 19). A strong marijuana odor emanated from the coolers and bags. (Id.). Lieutenant Picciotti believed there was enough marijuana present for a misdemeanor arrest; however, he testified that there was not enough residue to field test and confirm the presence of narcotics. (Id. at 53). The officers additionally found a receipt listing Defendant's name, a Newport cigarette pack, green cellophane, and blue painter's tape. (Id. at 19-20). Based on this collection of items, Lieutenant Picciotti believed there was evidence that marijuana was being packaged in Oregon and shipped to 200B Springhill Street. (Id. at 20).

Lieutenant Picciotti applied for a warrant to search 200B Springhill Street. (Id. at 20-21, 53; Doc. 59-1). The search warrant application details Picciotti's law enforcement background and experience in narcotics investigations. (Doc. 59-1, at 4-9). The application further explains the report of the confidential source and

the steps Lieutenant Picciotti took to corroborate the source's allegations, including the information he obtained during his initial investigation, his surveillance observations, and the results of the trash pull. (Id. at 14-19). Lowndes County Superior Court Judge James Tunison issued the search warrant at 7:26 a.m. on June 14, 2018. (Id. at 2). While Lieutenant Picciotti was obtaining the search warrant, law enforcement agents set up surveillance at both the Springhill Street and Corey Drive residences. (Doc. 46 at 21, 53).

Law enforcement officers executed the warrant at 200B Springhill Street around 10:00 a.m. on June 14. (Id. at 21). Officers found cardboard boxes, individually wrapped packages containing a total of slightly less than ten pounds of marijuana, three digital scales, materials consistent with re-packaging of marijuana, and a box of .45 caliber ammunition. (Id. at 22). Officers also located various documents listing the names of Defendant, Joey Jones, and a female with the last name Cato. (Id.).

Lieutenant Picciotti contacted DCS for assistance locating Defendant. (Id. at 24, 54). Lieutenant Picciotti believed he had sufficient probable cause to arrest Defendant for a probation violation and required the help of DCS to confirm Defendant's location. (Id. at 24, 55). DCS Officers Aton and Kromko responded. (Id. at 55). They telephoned Defendant, who stated he was at his girlfriend's home at 2311 Corey Drive. (Id. at 25, 55). Officers Aton and Kromko met

6

Lieutenant Picciotti and Investigators Ricks, Ammons, and Sparks at Corey Drive. (Id. at 25).

When Lieutenant Picciotti arrived at Corey Drive, he found Defendant in the living room of the home holding one of his children. (Id. at 25-26, 62). There were two other small children in the home. (Id. at 26, 62). Picciotti spoke with Defendant in the kitchen. (Id. at 26, 65). Picciotti explained why he was there and informed Defendant of his rights under Miranda. (Id. at 26, 67). Defendant did not appear impaired in any way. (Id. at 27, 67). He agreed to waive his Miranda rights and to speak with Lieutenant Picciotti without a lawyer. (Id. at 26, 67). Picciotti did not ask Defendant to sign a written waiver because their conversation was recorded on Picciotti's body-worn camera. (Id. at 68). Defendant initially denied knowledge of any illicit drug activity at 200B Springhill Street. (Id. at 26). As the conversation progressed, Defendant admitted to his involvement in trafficking marijuana through the mail. (Id. at 27). Defendant also consented to a search of the Corey Drive residence, which Lieutenant Picciotti noted smelled of marijuana. (Id. at 27, 69). Lieutenant Picciotti told Defendant he could revoke consent at any time, at which point Picciotti would apply for a search warrant of the home based on the marijuana odor. (Id.).

Defendant directed law enforcement agents to both drugs and a firearm concealed within the Corey Drive home. (Id. at 28). Officers recovered approximately five pounds of marijuana in the kitchen. (Id.). In the bedroom,

7

officers located another small amount of marijuana in a bedside table. (Id.). They found a Glock .35 caliber, semi-automatic firearm with a thirty-round magazine containing twenty-three rounds of ammunition on a bathroom shelf. (Id. at 28-29). There was approximately $11,200 in United States currency in a shoebox in the bedroom. (Id. at 29).

Lieutenant Picciotti sought and received consent to search Defendant's Tahoe and three cellular telephones. (Id. at 29, 73-74). Defendant was present in the garage during the search. (Id. at 29). An initial search of the phones produced evidence consistent with marijuana trafficking and distribution. (Id. at 30). The phones contained contact information for someone listed at "Flower Power." (Id. at 30). Defendant identified "Flower Power" as Joseph Patterson, his supplier in Oregon. (Id.).

DCS decided to arrest Defendant on a probation violation. (Id. at 30-31). Prior to transporting Defendant to the Sheriff's Office, officers conducted a search of Defendant's person. (Id. at 31). Officers recovered $1,100 or $1,200 during the search of Defendant. (Id.).

Lieutenant Picciotti conducted two more interviews with Defendant on June 19 and 26, 2018. (Id. at 32). Picciotti again read Defendant his rights under Miranda. (Id.). Defendant agreed to waive his rights. (Id.). Defendant explained that he attended a meeting in Las Vegas with marijuana growers seeking purchasers for excess crops. (Id.). A man named Ben invited Defendant to

Oregon, where he met Joseph Patterson. (Id. at 33). Defendant and Patterson entered into an arrangement whereby Patterson shipped marijuana from Oregon to Defendant in Georgia. (Id. at 34). Defendant established an account with Bank of America to facilitate the transfer of funds. (Id. at 33-34). He also used his brother Joey Jones' identification without consent to rent and to connect utilities at 200B Springhill Drive. (Id. at 34-35).

## II.   DISCUSSION

Defendant argues that any evidence recovered during the trash pull conducted at 200B Springhill Street should be suppressed because law enforcement officers had neither consent nor a search warrant for the contents of the trashcan.[2] Next, Defendant contends that the warrant issued for the search of 200B Springhill Street was invalid because the warrant was based on illegally obtained evidence and on the false statements of Lieutenant Picciotti. Defendant further argues that any evidence obtained during the search of 2311 Corey Drive,

---

[2] Defendant's motion to suppress raises five issues: (1) the legality of the trash pull; (2) the validity of the search warrant for 200B Springhill Street; (3) the voluntariness of Defendant's consent to search 2311 Corey Drive, Defendant's vehicle, and Defendant's cell phones; (4) the effectiveness of any Miranda waiver; (5) the legality of the search warrant issued for Defendant's Bank of America records. Defendant's post-hearing brief addresses some, but not all, of these same arguments. Based on the evidence presented during the two hearings, the Court reviews the merits of Defendant's arguments in support of suppressing evidence gathered during the trash pull as well as the voluntariness of Defendant's Miranda wavier. There was no evidence produced concerning the search warrant issued for Defendant's bank records. Accordingly, to the extent Defendant seeks suppression of those records, Defendant's motion is **DENIED**.

Defendant's vehicle, and his three cellular telephones should be suppressed because Defendant's consent was the product of coercion and not voluntary. Finally, Defendant moves to suppress any custodial statements because any waiver of Defendant's rights under Miranda was not knowingly, intelligently, and voluntarily made.

### A.    Trash Pull

Defendant argues that items seized from the trash can at 200B Springhill Street should be suppressed because officers lacked either consent or a search warrant for the trashcan. Defendant's position is premised on his contention that there is insufficient evidence that Defendant relinquished any privacy interest in the contents of the trash receptacle. Defendant's argument is not supported by the evidence or the law.

To prevail on a Fourth Amendment claim, a defendant first must show that there was a "search and seizure of that individual's person, house, papers or effects" amounting to "an invasion of the claimant's reasonable expectation of privacy." United States v. Bachner, 706 F.2d 1121, 1125 (11th Cir. 1983). Next, the defendant must demonstrate that the search was unreasonable. Id. "The party alleging an unconstitutional search must establish both a subjective and an objective expectation of privacy." United States v. Segura-Baltazar, 448 F.3d 1281, 1286 (11th Cir. 2006) (citing United States v. Robinson, 62 F.3d 1325, 1328 (11th Cir. 1995)). "The subjective component requires that a person exhibit

10

an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." Robinson, 62 F.3d at 1328 (internal quotation marks and punctuation omitted). In United States v. Greenwood, 486 U.S. 35, 39 (1988), the Supreme Court held that "[t]he warrantless search and seizure of garbage bags left at the curb outside the [defendant's] house would violate the Fourth Amendment only if [the defendant] manifested a subjective expectation of privacy in [his] garbage that society accepts as objectively reasonable."

The Supreme Court in Greenwood examined the Fourth Amendment implications of a trash pull conducted under circumstances similar to those presented here. There, law enforcement agents learned from a known criminal source that the defendant might be engaged in narcotics trafficking. Greenwood, 486 U.S. at 37. The police began conducting surveillance of the defendant's home, where they observed several vehicles making brief stops in the middle of the night and early morning. Id. The police solicited the help of the local trash collector to retrieve plastic garbage bags left on the curb of the defendant's home. Id. A search of the bags produced items suggestive of narcotics use. Id. at 38. The police used this evidence as a basis for obtaining a search warrant for the defendant's house, where the police found drugs. Id.

The Supreme Court explained that even though a defendant may not expect the contents of his trash to become known to the police or to the public,

11

"[a]n expectation of privacy does not give rise to Fourth Amendment protection . . . unless society is prepared to accept that expectation as objectively reasonable." Id. at 39-40. The court reached this conclusion based, in part, on the common knowledge that garbage placed "on or at the side of a public street [is] readily accessible to animals, children, scavengers, snoops, and other members of the public." Id. at 40 (citations omitted). The court further pointed out that the defendant intentionally placed the trash at the curb "for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through [the defendant's] trash or permitted others, such as the police, to do so." Id. Because the defendant deposited the garbage in a location "particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it," the defendant had no reasonable expectation of privacy in the discarded items. Id. at 40-41. Thus, the Court concluded that there was no Fourth Amendment violation. Id. at 40.

The same is true in this case. The evidence demonstrates that Lieutenant Picciotti first observed the trashcan along the side of the 200B Springhill Street residence. Picciotti made no attempt to access the contents of the trashcan until the date and time of regular trash collection for the neighborhood, at which point the trashcan had been moved from the side of the house to the street. Having placed his trash "in a location where it is routinely removed by trash collectors, on the day designated for trash collection," Segura-Baltazar, 448 F.3d at 1287

(emphasis removed), Defendant exposed his garbage "to the public sufficiently to defeat [his] claim to Fourth Amendment protection." <u>Greenwood</u>, 486 U.S. at 40. The Court therefore **DENIES** Defendant's motion to suppress the evidence collected during the June 14, 2018 trash pull.

### B.    Search Warrant Application

In his opening brief, Defendant argued that the search warrant issued for 200B Springhill Street was void because the warrant application was premised on illegally obtained evidence—the items collected from Defendant's trash. As discussed above, the Court concludes that there was no Fourth Amendment violation in relation to the trash pull conducted at the Springhill Street address. Accordingly, Defendant's argument that the search warrant is subsequently invalid lacks merit, and Defendant's motion to suppress evidence on this basis is **DENIED**.

In his post-hearing brief, Defendant raised a new argument pertaining to the legitimacy of the search warrant. Defendant now claims that the warrant was invalid because Lieutenant Picciotti made two false statements in the affidavit presented in support of the search warrant application. First, Defendant contends that Lieutenant Picciotti misrepresented that the marijuana residue identified in the bags retrieved from the trash pull field tested positive for marijuana. Second, Defendant claims Lieutenant Picciotti lied about finding a receipt for a money wire transfer from Defendant to someone in California. According to Defendant,

13

the only receipt found evidences a wire transfer from Defendant to Florida. In response, the Government states that even if these two statements were inaccurate, Lieutenant Picciotti's affidavit contained sufficient additional evidence to support a finding of probable cause to issue the warrant. The Court agrees.

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. Stanford Daily, 436 U.S. 547, 558 (1978)). A warrant affidavit "must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." Franks v. Delaware, 438 U.S. 154, 165 (1978). As the Supreme Court noted in Franks, "when the Fourth Amendment demands a factual showing sufficient to compromise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." Id. at 164-65 (emphasis in original) (internal quotation marks and citation omitted). "Truthful" does not mean that "every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." Id. at 165.

14

"There is, of course, a presumption of validity with respect to the affidavit supporting a search warrant." Id. at 171. Accordingly, to justify an inquiry into the veracity of an officer's affidavit, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement [was] necessary to the finding of probable cause." Id. at 155-56.[3] The "attack must be more than conclusory" and must include "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Id. at 171. "Allegations of negligence or innocent mistake are insufficient." Id. Nor will "[i]nsignificant and immaterial misrepresentations or omissions" invalidate a warrant. United States v. Sims, 845 F.2d 1564, 1571 (11th Cir. 1988).

"When assessing whether the alleged false statements and omissions were material, the trial court is to disregard those portions of the affidavit which the defendant has shown are arguably false and misleading." United States v.

---

[3] Typically, a defendant challenging a warrant affiant's statements would request a Franks hearing, where the burden would be on the defendant (1) to establish an allegation of perjury or reckless disregard by a preponderance of the evidence and (2) to show that the remaining content of the affidavit was insufficient to establish probable cause. Franks, 438 U.S. at 156. Defendant here did not raise the issue of Lieutenant Picciotti's alleged false statements until after the evidentiary hearing. The Court therefore did not have an opportunity to determine prior to the hearing whether Defendant could make "a substantial preliminary showing" that Lieutenant Picciotti made intentionally false or recklessly misleading statements in his warrant affidavit or whether those statements were "necessary to a finding of probable cause." Id. at 155-56.

Barsoum, 763 F.3d 1321, 1328-29 (11th Cir. 2014) (quotation marks and citing omitted). "The defendant bears the burden of showing that, absent those misrepresentations or omissions, probable cause would have been lacking." Id.

Defendant correctly identifies two inconsistencies between Lieutenant Picciotti's warrant affidavit and the evidence. Paragraph 35 of Picciotti's affidavit inventories the items collected during the trash pull. (Doc. 59-1 at ¶ 35). That list contains two entries Defendant claims are false. First, the affidavit indicates that law enforcement officials collected

> Two (2) white plastic garbage bags containing a variety of Styrofoam plates, food bags from carryout, drink cans, receipts, and large multi gallon size vacuum sealed bags with the odor of marijuana in them, as well as marijuana residue, which field tested positive by Affiant.

Id. Defendant takes issue with the statement "field tested positive by Affiant."

During the evidentiary hearing, when asked whether he had probable cause to arrest Defendant based on the evidence gathered from the trash pull, Lieutenant Picciotti testified,

> Possibly. The residual amount of marijuana—I didn't have enough to, like, field test and send to a lab at that point. I'd recovered a misdemeanor amount of marijuana, so could I have made a misdemeanor arrest? I believe I could.

(Doc. 46 at 53-54). Lieutenant Picciotti went on to explain that while there was not enough marijuana residue to make a felony arrest for intent to distribute, he believed the evidence was sufficient to suggest narcotics were concealed within the house. (Id. at 54).

16

Based on Picciotti's hearing testimony that there was not enough marijuana residue to "field test and send to a lab," Defendant argues Picciotti's affirmative statement in his warrant affidavit that the residue did field test positive for marijuana was an intentional misrepresentation. However, Defendant has presented no evidence that Lieutenant Picciotti intentionally or recklessly made a false statement beyond his unsupported belief. Moreover, Defendant has not shown that the probable cause determination relied upon a finding that the marijuana was field tested. There was sufficient other evidence in the affidavit, including statements that the bags emitted the odor of marijuana and Lieutenant Picciotti's experience as a narcotics officer, from which a neutral officer could determine that marijuana had been stored in the bags. Consequently, whether Lieutenant Picciotti field tested the residue identified in the bags was not, as Defendant suggests, "critical to the finding of probable cause." (Doc. 59, p. 10).

The Court is also unpersuaded by Defendant's contention that Lieutenant Picciotti lied about the receipt listed in the trash pull inventory. The warrant affidavit identifies "[r]eceipts in the name of JONES for money wired to California." (Doc. 59-1 at ¶ 35). An examination of the receipt, however, reveals that the wire transfer company has a California address, but Defendant actually sent the funds to someone in Florida. (Doc. 59-2). A review of the timeline is enough to suggest this error was most likely an error of haste and not a deliberate falsehood. Lieutenant Picciotti and the other officers retrieved the trash

from 200B Springhill Street around 4:00 a.m. on June 14, 2018. (Doc. 46 at 17, 51). Between 4:00 a.m. and 7:26 a.m., when the judge issued the search warrant (Doc. 59-1 at 2), the officers collected the trash, transported it back to the Sheriff's Office, searched and inventoried the contents, and completed the search warrant application. The receipt also was a small piece of the overall evidence and was just as likely meant to connect Defendant to the Springhill Street residence as it was to evidence Defendant's involvement in interstate drug trafficking. The receipt, therefore, was not material to a finding of probable cause.

Even if the Court were to accept Defendant's assertion that Lieutenant Picciotti deliberately misconstrued the nature of the items listed in the trash pull inventory, elimination of the receipt and any notation that the residue identified in the storage bags was field tested ultimately would not impact the finding of probable cause to issue the search warrant. Lieutenant Picciotti's affidavit in support of his application to search the premises at 200B Springhill Street was more than sufficient to provide the reviewing judge "with a substantial basis for determining the existence of probable cause." Illinois v. Gates, 462 U.S. 213, 239 (1983). Defendant's motion to suppress the fruits of the search of 200B Springhill Street is therefore **DENIED**.

### C.    Search of Corey Drive, Vehicle, and Cell Phones

Following the search of 200B Springhill Street, Lieutenant Picciotti contacted DCS for assistance locating Defendant. The probation office reached

18

Defendant, who confirmed he was at his girlfriend's house at 2311 Corey Drive. Two probation officers and three investigators met Lieutenant Picciotti at the residence. The probation officers initiated contact with Defendant. When Lieutenant Picciotti entered the home, he found Defendant in the living room holding one of his children. There were two other small children in the home. Lieutenant Picciotti then escorted Defendant into the kitchen where he told Defendant about the search conducted at the Springhill Street residence. At some point, Lieutenant Picciotti informed Defendant of his <u>Miranda</u> rights and sought Defendant's consent to search the house. Lieutenant Picciotti testified that he explained Defendant was not required to consent; but, if Defendant did not consent, Lieutenant Picciotti would apply for a warrant to search the residence based on the pervasive smell of marijuana in the home. Defendant not only consented but directed the officers to narcotics and a firearm. Lieutenant Picciotti sought and obtained independent consent to search Defendant's vehicle and three cellular telephones.

Defendant maintains that his consent was coerced and not voluntary and, consequently, that the evidence gathered during the search of 2311 Corey Drive, his vehicle, and his telephones should be suppressed. He claims he was threatened by the number of law enforcement officers in the home. Defendant further states he felt he had no option but to cooperate because law enforcement officers placed him in a position of having to "cho[o]se the welfare of his children

19

over his own." (Doc. 59, p. 15). Defendant asserts that Lieutenant Picciotti "manipulated the situation to place [Defendant] in the most vulnerable position, one that is the stuff of nightmares for most parents." (Id.).

As a general principle, a search conducted absent a warrant and probable cause is per se unreasonable under the Fourth Amendment. See Katz v. United States, 389 U.S. 347, 357 (1967). A well-settled exception to this rule arises when the search is conducted pursuant to voluntary consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (citing Davis v. United States, 328 U.S. 582, 593-94 (1946); Zap v. United States, 328 U.S. 624, 630 (1946)). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989) (citing Culombe v. Connecticut, 367 U.S. 568, 602 (1961)). "In examining all the surrounding circumstances to determines if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." Schneckloth, 412 U.S. at 229. "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).

There is no neat, talismanic definition for voluntary consent. Id. The inquiry must be conducted on a case-by case basis. Id. (citing Schneckloth, 412 U.S. at

224-25). The Eleventh Circuit has identified a non-exhaustive list of factors a court should consider when assessing whether consent was voluntary:

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984).

Defendant has presented no evidence to rebut Lieutenant Picciotti's testimony that Defendant's consent was freely and voluntarily given. In his post-hearing brief, Defendant discusses the timing between when the officers entered the home and when Defendant gave consent. He also describes the specific content of the conversation between Lieutenant Picciotti and Defendant. Presumably, Defendant garnered these details from the officer's body-worn camera footage. None of the body-camera footage was presented during the evidentiary hearing. The only evidence of this interaction is the testimony of Lieutenant Picciotti.

Lieutenant Picciotti testified that he had a calm, reasonable interaction with Defendant. Defendant was not forthcoming at first, but as the conversation continued, Defendant offered more information. Lieutenant Picciotti was aware prior to this interaction that Defendant was on probation and subject to a Fourth

Amendment waiver.[4] (Doc. 46 at 15-16, 27, 73). Nevertheless, he sought Defendant's consent to conduct a search. Lieutenant Picciotti was clear that Defendant had the right not to consent, though he did inform Defendant that a search warrant would be forthcoming if he did not consent. Defendant admits in his brief "[he] knew that he could refuse to continue to cooperate, it was his choice." (Doc. 59 at 16). Defendant also clearly knew there was incriminating

---

[4] At the time of this investigation, Defendant was on probation for a 2016 conviction in Cook County, Georgia. Defendant agreed to a Fourth Amendment waiver as a part of his sentence. (Doc. 31-2). The waiver provides,

> As part of my sentence, I hereby agree to waive my Fourth Amendment rights under the United States and Georgia Constitutions. I agree I can be searched any time, anywhere by any certified law enforcement officer, probation officer, or parole officer. The officer does not need to have a search warrant. The officer does not need to have probable cause to suspect I am doing something wrong. The officer does not have to have articulable suspicion that I am doing something wrong. The officer can search me, seize me, search and seize my property anytime, anywhere for any reason because that is a term and condition to which I have agreed.

(Id.). When a probationer voluntarily agrees to a "consent to search" provision as a term of his probation and officers reasonably suspect the probationer is engaged in criminal activity, the courts will uphold a search of the probationer's residence. See United States v. Knights, 534 U.S. 112, 119-20 (2001). This rule is rooted in the principle that "probationers do not enjoy the absolute liberty to which every citizen is entitled" because "a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." Id. at 119. Because Lieutenant Picciotti was armed with a valid Fourth Amendment waiver, and because he had reason to suspect that Defendant was engaged in a criminal enterprise, he did not need to obtain Defendant's consent. The fact that the officer took time to explain the reason for the search and sought consent lends credence to the Government's argument that Defendant's consent was voluntary and not coerced.

evidence in the home. Based on the totality of the circumstances known to the Court, there is no evidence that Defendant's consent to search 2311 Corey Drive, the vehicle, and the telephones was not knowing and voluntary. Defendant's motion to suppress the evidence obtained following the search is accordingly **DENIED**.

### D.  Custodial Statements

Defendant argues that the custodial statements made following his arrest should be suppressed in part because Lieutenant Picciotti did not provide him with a written Miranda waiver informing him of his rights. Defendant has pointed to no authority requiring that a Miranda waiver be written. Miranda warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." Michigan v. Tucker, 417 U.S. 433, 444 (1974). "Reviewing courts therefore need not examine Miranda warnings as if construing a will or defining the terms of an easement." Duckworth v. Eagan, 492 U.S. 195, 203 (1989). Courts simply must inquire whether the warning reasonably conveyed a suspect's rights as required by Miranda. Id. (quoting California v. Prysock, 453 U.S. 355, 361 (1981) (explaining that "no talismanic incantation [is] required to satisfy its strictures"). It is undisputed that Lieutenant Picciotti provided Defendant with a verbal Miranda warning. The verbal warning was sufficient to advise Defendant of his constitutional rights.

23

Defendant's argument that the Court should suppress his custodial statements because his arrest was based on unconstitutionally obtained evidence is equally unavailing. Law enforcement officers legally obtained the evidence that formed the basis of Defendant's arrest. Defendant's motion to suppress his custodial statements is **DENIED**.

## III.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Suppress (Doc. 30).

**SO ORDERED**, this 16th day of May, 2022.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

aks

24